**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| QUINTUS CORPORATION, et al., | ) | Case No. 01-00501(MFW) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | Jointly Administered |
| | ) | |
| KURT F. GWYNNE, CHAPTER 11 | ) | |
| TRUSTEE FOR THE ESTATE OF | ) | |
| QUINTUS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 05-50066 (MFW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON | ) | |
| (USA), INC., f/k/a DONALDSON, | ) | |
| LUFKIN & JENRETTE SECURITIES | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**[1]

Before the Court are the parties' cross motions for summary judgment.  Plaintiff, Kurt F. Gwynne, chapter 11 trustee for the estate of Quintus Corporation (the "Trustee"), moves for summary judgment on Count I of his Complaint for breach of fiduciary duty against Defendant, Credit Suisse First Boston (USA), Inc., f/k/a Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ").  DLJ moves for summary judgment in its favor on all counts of the Trustee's Complaint.  For the reasons set forth below, the Court will deny the Trustee's Motion and grant DLJ's Motion.

_____

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.    <u>BACKGROUND</u>

In 1999, Quintus Corporation ("Quintus"), a company that provided e-commerce software and services, retained DLJ as lead underwriter for its initial public offering ("IPO").  In an IPO, a group of underwriters, known as a syndicate, purchases all of the securities from the issuer and then markets and resells the securities to investors, profiting from the difference between the price at which it acquires the securities and the price at which it sells them.  Typically, the lead underwriter is responsible for marketing the IPO shares and determining their initial offering price, based on its expertise and knowledge of the market's demand for the shares.

At the time of Quintus' IPO, DLJ indirectly owned almost 12 million shares (more than 40%) of Quintus' common stock.  As a result, Rule 2720 of the Conduct Rules of the National Association of Securities Dealers, Inc. (the "NASD") required that Quintus retain a qualified independent underwriter ("QIU") to conduct due diligence and to recommend the maximum price at which the IPO shares would be sold by Quintus to the public.[2]

_____

[2] The purpose of Rule 2720 is to prevent insider shareholders from overpricing the stock at the IPO stage, in order to profit from selling their shares.  <u>See</u> Stephen J. Schulte, <u>Qualified Independent Underwriters: a Primer for the Practitioner</u> 463, 465 (Practicing Law Institute, Corporate Law & Practice Course Handbook Series, 1997) ("A potential conflict of interest arises between a member of the National Association of Securities Dealers, Inc. (the "NASD") and the public when the NASD member participates in a public offering of its securities,

Quintus therefore designated Dain Rauscher Wessels ("Dain"), one of the other underwriters for the IPO,[3] as the QIU.  Dain recommended that Quintus' stock be offered at a maximum price of $18 per share; the Pricing Committee of the Quintus Board of Directors followed that recommendation.  On the first day of trading (November 16, 1999), Quintus' stock closed at $55 per share and traded well above $18 for several months.

On February 22, 2001, Quintus filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Subsequently, Quintus sold substantially all of its assets to Avaya, Inc.  As a result of the sale, the claims of Quintus' creditors were paid in full or settled and satisfied, and more than $13 million was distributed to Quintus' shareholders pursuant to the chapter 11 plan, which was confirmed on March 2, 2006.

On January 30, 2002, the Court approved the Trustee.  On January 14, 2005, the Trustee commenced this adversary proceeding by filing a complaint against DLJ (the "Complaint") alleging, among other things, that DLJ had breached its fiduciary duty to Quintus by causing the IPO shares to be underpriced.  On February 14, 2005, DLJ filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court

---

securities of an affiliate or of an issuer in which the NASD member has an interest, or when a portion of the net proceeds are payable to the NASD member.").

[3]  Dain Rauscher Wessels, SG Cowen Securities Corporation, and DLJdirect, Inc. were the other underwriters of the syndicate for Quintus' IPO.

denied DLJ's motion and allowed the parties to conduct discovery.
At the conclusion of fact discovery,[4] the parties filed the
instant motions for summary judgment.  The matter has been fully
briefed and is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this
adversary proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)
(2006).  Many counts of the Complaint are core matters pursuant
to 28 U.S.C. § 157(b)(2)(A), (H), & (O) (2006).


III. <u>DISCUSSION</u>

A.   <u>Standard of Review</u>

The Court should grant a motion for summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c), incorporated by Fed. R.
Bankr. P. 7056.  <u>See also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
322 (1986); <u>Michaels v. New Jersey</u>, 222 F.3d 118, 121 (3d Cir.

---

[4]  The parties stipulated to postpone expert discovery until
after dispositive motions were decided.  In his reply to DLJ's
summary judgment motion, the Trustee now asks the Court to deny
or postpone decision on DLJ's motion until expert discovery is
concluded.  Because the Court finds that there are insufficient
facts to support the Trustee's complaint, the Court concludes
that expert discovery is not warranted.

2000); <u>Robeson Indus. Corp. v. Hartford Accident & Indem. Co.</u>, 178 F.3d 160, 164 (3d Cir. 1999). The movant bears the burden of establishing that no genuine issue of material fact exists. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986); <u>Integrated Water Res., Inc. v. Shaw Envtl., Inc.</u> <u>(In re IT Group, Inc.)</u>, 377 B.R. 471, 475 (Bankr. D. Del. 2007). A fact is material when it could "affect the outcome of the suit." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Horowitz v. Fed. Kemper Life Assurance Co.</u>, 57 F.3d 300, 302 n.1 (3d Cir. 1995); <u>Lony v. E.I. du Pont de Nemours & Co.</u>, 821 F. Supp. 956, 959 (D. Del. 1993).

If the movant establishes the absence of any genuine issue of material fact, the non-moving party has a duty to present specific facts demonstrating that there is a genuine issue of material fact for trial. <u>See</u> <u>Matsushita</u>, 475 U.S. at 586-87 (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts") (citations omitted); <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 633 (3d Cir. 1995). "Speculation and conclusory allegations do not satisfy this duty." <u>Ridgewood Bd. of Educ. v. N.E. ex</u> <u>rel. M.E.</u>, 172 F.3d 238, 252 (3d Cir. 1999) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment may be granted.

5

Matsushita, 475 U.S. at 587 (citations omitted).

    B.   Breach of Fiduciary Duty

Both parties filed cross motions for summary judgment on the Trustee's claim for breach of fiduciary duty. The Court will, therefore, consider them together.

The Trustee asserts that DLJ owed Quintus a fiduciary duty to set the maximum price of the IPO shares and that DLJ breached this duty by underpricing the IPO shares. The Trustee contends that DLJ underpriced the shares to permit DLJ to allocate the shares to its favored clients in exchange for investment banking business and profits from the aftermarket trading in the shares, pursuant to side agreements with its clients. As a result of DLJ's actions, the Trustee contends Quintus was deprived of millions of dollars of potential IPO proceeds.

DLJ responds that there is no factual or legal basis for the Trustee's allegations that DLJ owed fiduciary duties to Quintus and that it violated those duties by underpricing Quintus' IPO shares. DLJ asserts that (1) it had no role in setting the maximum price of Quintus' IPO shares because Quintus hired Dain as QIU, whose independent obligation was to set the upper limit for the shares' price; (2) DLJ did not have any obligation to set the price of Quintus' IPO shares above the price recommended by Dain, pursuant to the Underwriting Agreement which was the governing document establishing the parties' essential duties

concerning Quintus' IPO; and (3) Rule 2720(c)(3)(A) of the NASD
Conduct Rules expressly prohibited DLJ from setting the price of
Quintus' IPO shares above the price recommended by Dain.  In
addition, DLJ contends that the Trustee has provided no evidence
that DLJ received excessive compensation for its work as lead
underwriter on Quintus' IPO or that DLJ had side agreements with
its customers to allocate Quintus' IPO shares in exchange for
improper extra-contractual compensation.

    1.  <u>General Rule</u>

DLJ argues initially that there is no fiduciary duty owed by
an underwriter to the issuer of stock.  <u>See, e.g.</u>, <u>HF Mgmt.
Servs. LLC v. Pistone</u>, 818 N.Y.S.2d 40, 43 (N.Y. App. Div. 2006).

The Court agrees with DLJ that "New York law[5] [has] long
recognized the nonfiduciary nature of the underwriter-issuer
relationship," and "does not recognize the existence of a
fiduciary obligation that is based solely on the relationship
between an underwriter and an issuer."  <u>HF Mgmt. Servs.</u>, 818
N.Y.S.2d at 43 (finding no fiduciary relationship existed between
underwriter and issuer).  "In fact, not only is a fiduciary
aspect absent from the majority of underwriting relationships,
such relationships are better characterized as adversarial since
the statutorily-imposed duty of underwriters is to investors" not
to the issuer of the stock.  <u>Id.</u> (citing 15 U.S.C. § 77g).  An

_____

    [5]  The parties' contract provides that New York law shall
apply.  <u>See</u> Underwriting Agreement § 11, at 25.

7

underwriter's fiduciary duty to the issuer, if there is one, "is limited to the underwriter's role as advisor.  We do not suggest that underwriters are fiduciaries when they are engaged in activities other than rendering expert advice."  EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (N.Y. 2005).

 2.  Exception to General Rule

The Trustee contends, however, that New York caselaw recognizes that a fiduciary relationship can arise where the issuer placed special reliance on the underwriter.  See, e.g., EBC I, 832 N.E.2d at 31 ("[A] cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone."); Breakaway Solutions, Inc. v. Morgan Stanley & Co., No. Civ. A. 19522, 2005 WL 3488497, at *2 (Del. Ch. Dec. 8, 2005) ("To the extent that underwriters function, among other things, as expert advisors to their clients on market conditions, a fiduciary duty may exist."); Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 399 F. Supp. 2d 375, 382-83 (S.D.N.Y. 2005) (sustaining claim that DLJ, "as an advisor and underwriter to [issuer], had a fiduciary duty 'to refrain from doing any act injurious to, or which would deprive [issuer] of any profit or advantage'") (emphasis added);

8

Bestolife Corp. v. Am. Amicable Life, 774 N.Y.S.2d 18, 23 (N.Y. App. Div. 2004) ("Although plaintiffs under that agreement were responsible for the final decision, there are significant allegations that [the provider of investment and banking services] was obliged to impart all relevant advice and that there was a breach of that obligation.").

DLJ argues that the cases cited by the Trustee are distinguishable and that the general rule rather than the exception applies in this case.  The New York Court of Appeals in EBC I "made quite clear that [finding the existence of fiduciary duties in that] case was, colloquially speaking, the exception that proves the rule."  EBC I, 832 N.E.2d at 42 (citation omitted).  DLJ asserts that the Trustee's reliance on EBC I is misplaced because that case did not involve an underwriter with a significant equity interest in the issuer that required the hiring of a QIU to recommend the maximum price of its IPO shares.

The Trustee contends that the relationship between Quintus and DLJ was not limited to a contractual one and that Quintus' management, which lacked experience in the complex matters of an IPO, placed its trust in DLJ to set the offering price of its shares to maximize the proceeds from its IPO.  He asserts that Quintus relied exclusively on DLJ and its specialized expertise and knowledge to set the maximum offering price of its IPO shares.

9

DLJ replies that Quintus hired Dain as QIU to set the upper limit for the price of Quintus' IPO shares.  DLJ claims that the Underwriting Agreement between it and Quintus did not require that DLJ set the price of Quintus' IPO shares above the price recommended by Dain.  Further, DLJ argues that Rule 2720(c)(3)(A) of the NASD rules expressly prohibited DLJ from setting the price of Quintus' IPO shares above the price recommended by Dain.

Whether an underwriter has a fiduciary duty to the issuer of an IPO under New York law requires a fact-specific determination by the Court.  <u>Id.</u> at 33 n.5.  The Court agrees with DLJ that the evidence[6] demonstrates that Quintus did not rely upon DLJ to set the maximum selling price for the IPO shares.  In the record before it, the Court finds nothing to suggest that the relationship between DLJ and Quintus rose above the typical contractual relationship between an issuer and its underwriter.

a.   <u>Contract Between the Parties</u>

The Underwriting Agreement between the parties specifically provides that:

> [Quintus] hereby confirms its engagement of [Dain] as, and [Dain] hereby confirms its agreement with [Quintus] to render services as, a "qualified independent underwriter", within the meaning of Section (b)(15) of Rule 2720 of the Conduct Rules of the

---

[6]   The Court is disturbed by the fact that the Trustee, in his opening brief, fails to mention (or attempt to distinguish) the provisions of the Underwriting Agreement, the Prospectus, and Rule 2720(c)(3)(A) of the NASD rules that evidence that it was Dain's obligation, not DLJ's, to recommend the price of Quintus' IPO shares.

> National Association of Securities Dealers, Inc. with
> respect to the offering and sale of the Shares. . . .
> <u>The Price at which the Shares will be sold to the</u>
> <u>public shall not be higher than the maximum price</u>
> <u>recommended by the QIU</u>.

Underwriting Agreement § 2, at 3-4 (emphasis added).

The Prospectus also confirms that Dain would fix the maximum
price of Quintus' IPO shares:

> Because the Sprout Entities affiliated with Donaldson,
> Lufkin & Jenrette Securities Corporation beneficially
> own more than 10% of the outstanding common stock, this
> offering is being conducted in accordance with Rule
> 2720 of the Conduct Rules of the National Association
> of Securities Dealers, Inc., which provides that <u>the</u>
> <u>public offering price of an equity security be no</u>
> <u>higher than that recommended by a "qualified</u>
> <u>independent underwriter"</u> meeting certain standards.  In
> accordance with this requirement, <u>Dain Rauscher</u>
> <u>Wessels, a division of Dain Rauscher Incorporated, will</u>
> <u>assume the responsibilities of acting as qualified</u>
> <u>independent underwriter and will recommend a price in</u>
> <u>compliance with the requirements of Rule 2720</u>.

Prospectus at 77 (emphasis added).

Nevertheless, the Trustee attempts to find support for his
claim that DLJ was responsible for determining the maximum price
of Quintus' IPO shares by relying on the Master Agreement Among
Underwriters (the "Master Agreement") which stated that DLJ, as
lead underwriter, had "sole discretion" to "determine . . . the
initial public offering price" and to "make any changes in the
public offering price."

The Court finds the Trustee's reliance on the Master
Agreement misplaced.  The Master Agreement, dated March 1, 1993,
is a general agreement that makes no reference to Quintus' IPO

11

which occurred six years later in 1999.  Moreover, the Master
Agreement does not address the specific situation in this case:
where a QIU is required under Rule 2720(c)(3)(A) of the NASD
Conduct Rules.  The Trustee's reliance on the Master Agreement is
even further diminished by the fact that both the Underwriting
Agreement (which was the specific governing contract between
Quintus and its four underwriters for the IPO) and the Prospectus
specifically provide that Dain, as QIU, would determine the
maximum price of Quintus' IPO shares.  See, e.g., Midwest Fin.
Acceptance Corp. v. Fed. Deposit Ins. Corp., 93 F. Supp. 2d 327,
332 (W.D.N.Y. 2000) ("Another well-established principle of
contract construction is that 'specific terms of a contract will
control over more general terms . . . .'") (citations omitted);
Muzak Corp. v. Hotel Taft Corp., 133 N.E.2d 688, 690 (N.Y. 1956)
("Even if there was an inconsistency between a specific provision
and a general provision of a contract (we find none), the
specific provision controls.") (citation omitted).

      b.   NASD Rules

Even if the parties' contract did not so state, the Court
finds that the applicable rules of the NASD precluded DLJ from
determining the maximum price for Quintus' IPO shares.  Rule
2720(c)(3)(A) of the Conduct Rules of the NASD (1) required
Quintus to hire Dain to conduct independent due diligence and to
recommend the maximum price for Quintus' IPO shares and (2)

12

prohibited DLJ from pricing the IPO shares above the price recommended by Dain.[7]  Dain sent a letter to the NASD confirming that Dain (a) "meets the definition of a 'Qualified Independent Underwriter'," (b) "agrees . . . to undertake the legal responsibilities and liabilities of an underwriter under the Securities Act of 1933," (c) "has performed due diligence in connection with [Quintus'] proposed offering," and (d) will "provide under separate cover a draft form of pricing opinion . . . ." (Dain's letter to the NASD, dated Nov. 8, 1999.)  Dain's General Counsel testified at his deposition that Dain met all of its obligations as the QIU for Quintus' IPO.  (Martin Dep. 39:12-40:12.)

c.   No Evidence of Reliance

The Trustee contends, nonetheless, that in fact DLJ rather than Dain set the IPO share price.  The Trustee asserts that DLJ was free to set a price higher than $18 per share before Dain made its recommendation.  The Trustee also asserts that DLJ had knowledge of the market's demand for Quintus' IPO shares, based on its "order book" which was the core source of information used

---

[7]  See Harden v. Raffensperger, Hughes & Co., 65 F.3d 1392, 1403 (7th Cir. 1995) ("[T]he qualified independent underwriter fulfills a role that was very important in the eyes of the 1933 Congress – protection of the investing public.").  See also Nat'l Ass'n of Sec. Dealers, Inc., Rules of Conduct, R. 2720, n.* ("In the opinion of the Association and the Commission the full responsibilities and liabilities of an underwriter under the Securities Act of 1933 attach to a "qualified independent underwriter" performing the functions called for by the provisions of [Rule 2720(c)].").

in determining the price of the IPO shares.  The Trustee further
contends that DLJ unilaterally set the IPO shares' final price
and that Dain, in its role as the QIU, had no involvement in
setting the price of Quintus' IPO shares but merely rubber-
stamped the price DLJ had determined.

In response, DLJ contends that no one has ever testified
that DLJ, rather than Dain, actually set the maximum price for
the IPO or that DLJ could have priced Quintus' IPO shares above
the price recommended by Dain.  DLJ points to numerous instances
where the Trustee misrepresents the record.[8]

The Court agrees with DLJ that there is no support in the
record for the Trustee's contention that Quintus relied
exclusively[9] on DLJ to set the price of the IPO shares.  Rather
than acknowledging this, however, the Trustee makes broad
allegations of facts supportive of his case with citations to the
depositions.  The Court finds that most of these references are
wrong or misleading.

For example, in his answering brief in opposition to DLJ's
motion for summary judgment, the Trustee states that "the QIU
played no role in determining the IPO share price" and that

_____

    [8]  See DLJ's Memorandum of Law in Opposition to the
Trustee's Motion for Summary Judgment at 5-7.

    [9]  The Court finds that the Trustee's allegation of Quintus'
"exclusive" reliance on DLJ in managing and pricing Quintus' IPO
is disingenuous in light of the fact that there were four
underwriters assisting Quintus in connection with its IPO.  (See
Underwriting Agreement at 1.)

"DLJ's most crucial role was to set the price at which [Quintus'] shares would be offered to the public."  However, neither the record in general nor the specific citation by the Trustee supports the Trustee's bold statement.  (See Salvesen Dep. 113 (Ms. Salvesen did not speak about "DLJ's most crucial role"); Anderson Dep. 169:13-18 (quoting the question that Mr. Anderson was asked, not the response).)

Many of the other references by the Trustee are out-of-context citations to deposition testimony regarding Dain's role as a co-managing underwriter or as a syndicate member, not its role as QIU in Quintus' IPO.[10]  In fact, there is evidence in the record that Dain performed its role as QIU.[11]

---

[10]  For example, Ms. Pralle was asked to describe Dain's activities as a syndicate member, not QIU, and answered accordingly.  (See Pralle Dep. 23:9-15.)  Mr. Massad prefaced his answer to questions about Dain's role by stating "Whether we were a lead manager . . . ; whether we were a co-manager or if we were merely an underwriting syndicate member the individuals involved [in IPO pricing decisions] would vary . . . depending on our role."  (See Massad Dep. 36:17-37:9.)  Importantly, Mr. Massad stated that he did not have any recollection about Dain's role as QIU in the Quintus IPO.  (See Massad Dep. 39:3-6.)

[11]  For example, the Trustee cites Mr. Martin's response that "Standard protocols would have been that the book-running manager [DLJ] would determine the – the price."  (Martin Dep. 68:20-22.)  However, Mr. Martin subsequently stated that "And where there's a QIU involved, as there is in this case – or was in this case, the book-running manager, I would have to assume, would consult with the QIU prior to - prior to a pricing call.  And assuming that – and the two firms would be in contact with each other, would have an agreement as to what – what price the QIU would be comfortable with. . . . "  (Martin Dep. 68:20-69:7.)  See also Dain's Letter to Quintus, dated Nov. 15, 1999.

The Trustee further misrepresents the record when he states that Mr. Burke, Quintus' president, "relied completely on DLJ to price the Quintus IPO." The record cited by the Trustee does not mention Mr. Burke's reliance on DLJ "to price the Quintus IPO." In fact, Mr. Burke stated that he did not have any role or responsibility in connection with the IPO. (Burke Dep. 18:24-19:2.) In discussing the underwriters' expertise, Mr. Burke stated that the underwriters were hired "to sell and market the shares of the company" and "to provide analyst research on the company, to continue to support a fair market value of that company." (Burke Dep. 72:10-18.) Nothing in the Trustee's citation to Burke's deposition establishes that Quintus "relied completely on DLJ to price the Quintus IPO" as the Trustee contends.

The Court is very disturbed by the Trustee's attempts to misrepresent the record and to mislead the Court. Suffice it to say, it caused the Court to review the record presented by the parties very carefully to ascertain if there were any support for the Trustee's hyperbole. The Court found nothing to support the Trustee's allegation that Dain did not perform its role as QIU in recommending the maximum IPO share price or that DLJ usurped or interfered with that role.

d.   No Reasonable Reliance

Even if Quintus' management had relied on DLJ to maximize the price of its IPO shares, the reliance was not reasonable in light of Quintus' express acknowledgment in the Underwriting Agreement that it was Dain's obligation to set the maximum selling price.  See WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (N.Y. App. Div. 2001) (citations omitted) ("A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms length business relationship does not give rise to a fiduciary obligation." ) (emphasis added).  See also Edgar v. Avaya, Inc., No. 05-3598, 2006 U.S. Dist. LEXIS 23151, at *31 (D.N.J. Apr. 24, 2006) ("Not even a fiduciary acting in its fiduciary capacity is permitted to engage in insider trading."); In re McKesson HBOC, Inc. ERISA Litig., No. C00-20030 RMW, 2002 U.S. Dist. LEXIS 19473, at *21 (N.D. Cal. Sept. 30, 2002) (citation omitted) ("Fiduciaries are not obligated to violate the securities laws in order to satisfy their fiduciary duties.").

The Court further concludes that EBC I, on which the Trustee relies, is distinguishable from this case.  First, the issuer in EBC I was not required to hire a QIU, pursuant to the NASD rules.  Second, as found above, Quintus could not reasonably rely on DLJ to determine the maximum price of Quintus' IPO shares because of

17

DLJ's stock ownership and the applicable NASD rules.  Third,
unlike the underwriter in <u>EBC I</u>, DLJ did not have any undisclosed
conflicts which could interfere with its duties in the IPO
process.

e.   <u>Side Deals with Customers</u>

Finally, DLJ contends that the Trustee has provided no
evidence that DLJ received excessive compensation for its work as
lead underwriter on Quintus' IPO or that DLJ had side agreements
with its customers to allocate Quintus' IPO shares in exchange
for improper extra-contractual compensation.

The Trustee, apparently acknowledging this, asks the Court
to delay ruling on DLJ's motion for summary judgment until after
expert discovery is concluded.  He asserts that his expert will
establish that in setting the IPO price, DLJ acted with the
expectation that its favored clients who were permitted to buy
the IPO stock would compensate DLJ.

An expert's opinion based on mere allegations that are not
supported by the record, however, is meaningless.  <u>See</u> <u>Am. Int'l</u>
<u>Adjustment Co. v. Galvin</u>, 86 F.3d 1455, 1464 (7th Cir. 1996)
(Posner, C.J., dissenting) ("[A]n expert' opinion based on
'unsupported assumptions' and 'theoretical speculations' is no
bar to summary judgment.") (citations omitted).  <u>See also</u> <u>Upper</u>
<u>Deck Co. v. Breakey Int'l, BV</u>, 390 F. Supp. 2d 355, 361 (S.D.N.Y.
2005) ("An expert's opinion is not a substitute for a plaintiff's

18

obligation to provide evidence of facts that support the applicability of the expert's opinion to the case.") (citations omitted).  In the record before it, the Court finds no evidence to support the Trustee's claim that DLJ had "side agreements" with its clients by which DLJ received improper extra-contractual compensation in exchange for allocating Quintus' IPO shares to them.

For the foregoing reasons, the Court concludes that the Trustee has failed to carry its burden of establishing that DLJ had a fiduciary duty which it breached.  Consequently, the Court will deny the Trustee's motion for summary judgment and grant DLJ's motion for summary judgment on the Trustee's claim for breach of fiduciary duty.

C.  <u>DLJ's Motion for Summary Judgment on Trustee's Remaining Claims</u>

DLJ also moves for summary judgment on each of the remaining claims of the Complaint: (1) breach of contract, (2) breach of an implied covenant of good faith and fair dealing, (3) fraud and fraudulent concealment, (4) negligence, and (5) unjust enrichment.

1.  <u>Breach of Contract Claim</u>

DLJ asserts that there is no factual or legal basis to support the Trustee's claim that DLJ breached the Underwriting Agreement by allocating Quintus' IPO shares to its favored clients in exchange for additional compensation pursuant to side

19

agreements with the clients.  DLJ argues that nothing in the
Underwriting Agreement precluded DLJ from selling Quintus' IPO
shares to its clients.  See e.g., Breakaway Solutions, Inc. v.
Morgan Stanley & Co., No. Civ. A. 19522, 2004 WL 1949300, at *11
(Del. Ch. Aug. 27, 2004) ("To hold that all or a certain
percentage of an IPO must be sold to the populace in general (or
any particular subset thereof) would be inconsistent with the use
of the term 'public' in the Agreement.") (citation omitted).  In
addition, DLJ asserts that the Trustee has presented no evidence
of any "side agreements" pursuant to which DLJ was to receive
additional compensation for allocating the IPO shares to any
specific client.

The Trustee responds that DLJ breached the Underwriting
Agreement when it underpriced Quintus' shares in exchange for
extra-contractual compensation.  According to the Trustee,
Quintus "reasonably expected under the Underwriting Agreement
that DLJ, as its underwriter, would sell [Quintus'] shares at a
price that maximized proceeds" to Quintus.  The Trustee asserts
that DLJ underpriced the IPO shares in violation of Quintus'
expectations under the Underwriting Agreement.

The Court concludes that the Trustee's claim for breach of
contract must be dismissed because the Trustee can identify no
specific provision of the Underwriting Agreement that DLJ
breached.  See EBC I, 832 N.E.2d at 33 (holding that "the courts

below properly dismissed the claim for breach of contract in the absence of an allegation that [the underwriter] breached any provisions of the underwriting agreement.").[12]  See also Xpedior Creditor Trust, 399 F. Supp. 2d at 378 (withdrawing issuer's breach of contract claim against the underwriter in aftermath of EBC I decision); Breakaway Solutions, 2005 WL 3488497, at *2 (dismissing claim for breach of contract under the principles set forth in EBC I).

Even if there was a basis for such a claim, the Trustee has failed to present any facts supporting his allegations.  See Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."); Ridgewood Bd. of Educ., 172 F.3d at 252 (citation omitted) ("Speculation and conclusory allegations do not satisfy [the non-moving party's] duty.").  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

---

[12]  In support of his breach of contract claim, the Trustee relies on cases that predate EBC I.  The Court finds the Trustee's failure to note EBC I's dismissal of the breach of contract claim on facts similar to this case remarkable, considering that the Trustee relies on EBC I extensively for his other arguments.

21

<u>Anderson</u>, 477 U.S. at 247-48 (1986).

Specifically, the Trustee has failed to identify any DLJ clients with whom DLJ allegedly entered into a side agreement or the terms of any such agreement.  Moreover, the Trustee has presented no evidence that the DLJ clients which acquired Quintus' stock shared their profits with DLJ.  Nor has the Trustee submitted any evidence that "the alleged favoritism towards flippers resulted from any <u>quid pro quo</u> arrangements, or indeed any evidence that suggests that the alleged discrepancy favoring flippers over aftermarket purchasers resulted from any wrongdoing on the part of DLJ."  <u>Xpedior Creditor Trust</u>, 399 F. Supp. 2d at 385.

As a result, the Court will grant DLJ's motion for summary judgment on the claim for breach of contract.

> 2.   <u>Breach of Implied Covenant of Good Faith and Fair</u>
> <u>Dealing</u>

DLJ moves for summary judgment on the Trustee's claim for breach of an implied covenant of good faith and fair dealing on the ground that the covenant "cannot be used to add duties inconsistent with the contract . . . ."  <u>A. Brod, Inc. v.</u> <u>Worldwide Dreams, L.L.C.</u>, No. 114130/03, 2004 WL 1563352, at *2 (N.Y. Sup. Ct. May 7, 2004) (citing <u>Murphy v. Am. Home Prods.</u> <u>Corp.</u>, 448 N.E.2d 86, 91 (N.Y. 1983) ("No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship.")).  According to DLJ, the express

22

terms of the Underwriting Agreement required that Dain recommend the maximum price of Quintus' IPO shares.  This precludes any implied duty of DLJ to set a price in excess of the maximum price recommended by Dain.

The Trustee responds that the Underwriting Agreement did not preclude DLJ from setting a price in excess of the maximum price recommended by Dain.  According to the Trustee, "DLJ ignores the plain language of the Underwriting Agreement, under which Dain Rauscher was engaged not to independently set a maximum price, but only 'to render services as [a QIU] within the meaning of Section (b)(15) of Rule 2720 of the [NASD Manual].'"  The Trustee asserts that his claim does not create new duties or contradict the express terms of the Master Agreement, pursuant to which DLJ had "sole discretion" to "make any changes in the initial offering price."  (Master Agreement § 4, at 6.)  Moreover, the Trustee claims that DLJ's obligations under the Underwriting Agreement were to obtain the highest IPO price without "leaving money on the table."  DLJ's failure to set the IPO price at a level that would maximize Quintus' IPO proceeds deprived Quintus of its reasonable expectation, according to the Trustee.

The Court concludes that DLJ is entitled to summary judgment on the Trustee's claim for breach of the implied covenant of good faith and fair dealing because DLJ fulfilled its contractual obligations.  <u>See, e.g.</u>, <u>EBC I</u>, 832 N.E.2d at 33 (dismissing a

similar claim for breach of an implied covenant of good faith and fair dealing where the principal contractual objectives of the IPO, i.e., increasing the working capital and creating a public market for the issuer's stock, were achieved as a result of the underwriter's services); Xpedior Creditor Trust, 399 F. Supp. 2d at 384-85 (granting summary judgment on a similar claim for breach of an implied covenant and good faith against an underwriter); Breakaway Solutions, 2005 WL 3488497, at *1 ("As in EBC I, the contractual objectives, as set forth in the controlling underwriting agreement, were achieved by the Defendants as underwriters and conferred upon [the] issuer.").

As noted above, the Court finds that Dain had the specific obligation as QIU to recommend the maximum price for Quintus' IPO shares under the Underwriting Agreement.  Not only did DLJ not have any obligation to set the maximum price under the Underwriting Agreement, but DLJ was not able to raise the maximum price set by Dain without violating Rule 2720(c)(3)(A) of the NASD Conduct Rules.  Therefore, the Court cannot find that DLJ impliedly agreed to price Quintus' IPO shares above Dain's recommendation.  The Trustee's reliance on the Master Agreement, which neither mentions Quintus' IPO nor addresses the required presence of a QIU under Rule 2720(c)(3)(A), is misplaced.

Consequently, the Court will grant DLJ's motion for summary judgment on the Trustee's claim for breach of an implied covenant

of good faith and fair dealing.

### 3.    Fraud and Fraudulent Concealment

DLJ moves for summary judgment on the Trustee's claim for fraud and fraudulent concealment, arguing that the Trustee has failed to prove either claim.  With regard to fraud, DLJ contends that the Trustee has failed to identify any material false representations made by DLJ regarding the price of Quintus' IPO shares.  DLJ also notes that the Trustee has failed to present evidence of Quintus' reliance on DLJ to set the maximum price of the IPO shares.  In addition, DLJ asserts that the Trustee has failed to show that DLJ had any intent to underprice Quintus' shares.  DLJ argues that, because of its ownership interest in Quintus' stock, it might have been inclined to underprice, rather than underprice, Quintus' shares to increase the value of its stake in Quintus.

On the fraudulent concealment claim, DLJ contends that the Trustee has failed to prove an essential element, namely that DLJ owed Quintus any fiduciary duty to set the maximum price of Quintus' IPO shares.  Moreover, DLJ asserts that the Trustee has provided no evidence that DLJ withheld any material information.

In response, the Trustee claims that DLJ fraudulently underpriced Quintus' shares by (1) intentionally misrepresenting the market price of Quintus' IPO shares to the Pricing Committee of the Quintus Board of Directors and (2) withholding material

information regarding the overwhelming public demand for Quintus'
IPO shares that would have justified a price higher than $18 per
share.  In support of his fraudulent concealment claim, the
Trustee argues that, even in the absence of a fiduciary
relationship, a duty to disclose arises where "one party's
superior knowledge of essential facts renders a transaction
without disclosure inherently unfair."[13]  In addition, the
Trustee contends that Quintus' exclusive reliance upon DLJ in
managing its IPO and pricing its IPO shares obligated DLJ to
disclose material information concerning the IPO, including DLJ's
allocation of the IPO shares to its favored clients in exchange
for improper compensation pursuant to side agreements.

     The elements of a claim for fraud are a "representation of a
material existing fact, falsity, scienter, deception and injury."
IDT Corp. v. Morgan Stanley Dean Witter & Co., 847 N.Y.S.2d 902,
No. 603710-04, 2007 WL 2386459, at *4 (N.Y. Sup. Ct. 2007)
(citing Megaris Furs, Inc. v. Gimbel Bros., Inc., 568 N.Y.S.2d
581, 582 (N.Y. App. Div. 1991)).  The elements of a claim for
fraudulent concealment are "the same, with the addition that the
party charged with fraud must have had a duty to disclose
material information, due to being a fiduciary of the party
alleging fraud, and failed to do so."  Id. (citations omitted).

_____

     [13] The Trustee cites Robinson v. Crawford, 847 N.Y.S.2d 167,
168 (N.Y. App. Div. 2007) for this proposition.  The Court,
however, is unable to locate the language quoted by the Trustee
in that case.

See also Robinson v. Crawford, 847 N.Y.S.2d 167, 168 (N.Y. App.
Div. 2007) ("[A]n omission does not constitute fraud unless there
is a fiduciary relationship between the parties.").

     The Court finds that the Trustee has presented no evidence
that DLJ made a material misrepresentation regarding the market
price of Quintus' IPO shares.  The Court finds that the Pricing
Committee of the Quintus Board of Directors approved the ultimate
price of the IPO shares at $18 per share, based on Dain's
recommendation.  (See Dain's Letter to Quintus dated Nov. 15,
1999.  See also Minutes of a Special Meeting of the Pricing
Committee of the Board of Directors of the Quintus Corporation,
dated Nov. 15, 1999.)  Therefore, the Trustee's claim that
Quintus exclusively relied on DLJ to set the maximum price of the
IPO shares is baseless in light of Dain's specific obligation to
recommend the maximum price as QIU, pursuant to both the
Underwriting Agreement and Rule 2720(c)(3)(A).

     The Court further concludes that the Trustee's claim for
fraudulent concealment is defective as a matter of law because
DLJ had no fiduciary duty to Quintus with respect to setting the
maximum price of the IPO shares.  Moreover, the Court finds that
the Trustee's claim that DLJ breached its duty to disclose
material information regarding the overwhelming public demand for
Quintus' IPO shares is unsupported because Quintus' management
knew that its stock was oversubscribed by double figures before

the IPO.   (See Anderson Dep. 149:1-24, Salvesen Dep. 44:7-45:8.)
Furthermore, even if DLJ had disclosed that information, under
the NASD rules Quintus could not have priced its IPO shares above
the price recommended by Dain, regardless of the demand.   In
addition, the Trustee has provided no evidence that the demand
for Quintus' IPO shares would have remained strong at any price
higher than $18.   Finally, the Trustee has provided no evidence
to support his claim that DLJ allocated Quintus' IPO shares to
its favored clients in exchange for improper compensation
pursuant to side agreements.

     For the foregoing reasons, the Court will grant DLJ's motion
for summary judgment on the Trustee's claim for fraud and
fraudulent concealment.

          4.   Negligence

     DLJ moves for summary judgment on the Trustee's claim for
negligence for the same reasons: DLJ did not owe Quintus a duty
to set the maximum price of the IPO shares and Quintus did not
(and could not) rely on DLJ to set the IPO price higher than the
price recommended by Dain.

     The Trustee responds by claiming that DLJ owed Quintus an
independent, extra-contractual duty to set the maximum price of
Quintus' IPO shares.   The Trustee argues that DLJ knew that
Quintus' stock was significantly oversubscribed and that, as a
result of the strong demand, Quintus should have set the price

28

higher than $18 per share.  According to the Trustee, DLJ unilaterally set the price without any substantive input from Dain, thereby breaching its duty to Quintus and leaving millions of dollars "on the table."

The Trustee's claim for negligence must be dismissed under the "well-established principle that a simple breach of contract claim is not to be considered a tort unless a legal duty independent of the contract itself has been violated."  Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 194 (N.Y. 1987) (upholding dismissal of the plaintiff's claim for negligence that was "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract") (citations omitted).

Furthermore, as the Court found above, DLJ did not owe Quintus a duty to set the maximum price of the IPO shares. Moreover, Quintus could not reasonably have relied on DLJ to set the IPO price higher than the price recommended by Dain in violation of Rule 2720(c)(3)(A), regardless of the demand for the stock.

For the foregoing reasons, the Court will grant DLJ's motion for summary judgment on the Trustee's negligence claim.

5.   Unjust Enrichment

DLJ moves for summary judgment on the Trustee's claim for unjust enrichment as duplicative of his breach of contract claim. DLJ also asserts that the Trustee has provided no evidence that DLJ entered into any improper "side agreements" or that it received any improper compensation in connection with Quintus' IPO.

The Trustee contends that his claim for unjust enrichment should not be dismissed as duplicative because it is not based on the Underwriting Agreement.  The Underwriting Agreement, as the Trustee asserts, does not address DLJ's compensation other than the 7% underwriting fee specified in the agreement.  The Trustee seeks disgorgement of DLJ's extra-contractual compensation allegedly received by DLJ from its favored customers in exchange for underpricing Quintus' IPO shares.

The Court agrees with DLJ that the Trustee's claim for unjust enrichment must be dismissed as a matter of law because the Underwriting Agreement governed the parties' relationship. "[T]he existence of a valid contract governing the subject matter generally precludes recovery in quasi contract for events arising out of the same subject matter." EBC I, 832 N.E.2d at 33-34 (citing Clark-Fitzpatrick, Inc., 516 N.E.2d at 193). See also Breakaway Solutions, 2005 WL 3488497, at *2 ("There is a valid contract governing the subject matter and the challenged conduct

30

arises out of the same subject matter.  It follows that [the issuer's] claim for unjust enrichment [against its underwriters] fails as a matter of law.").

Even if such a claim could be pursued, the Court finds that the Trustee has presented no evidence that DLJ received any extra-contractual compensation in connection with Quintus' IPO.

For the foregoing reasons, the Court will grant DLJ's motion for summary judgment on the Trustee's unjust enrichment claim.

IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will deny the Trustee's Motion for Summary Judgment and grant DLJ's Motion for Summary Judgment on all counts of the Complaint.

An appropriate Order is attached.


Dated: November 7, 2008          BY THE COURT:



                                 Mary F. Walrath
                                 United States Bankruptcy Judge